WILLIAM J. DUFFEY AND FREIDA M. DUFFEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Duffey v. Commissioner
Docket No. 29300-86
United States Tax Court
T.C. Memo 1993-186; 1993 Tax Ct. Memo LEXIS 189; 65 T.C.M. (CCH) 2508; April 27, 1993, Filed *189 Decision will be entered under Rule 155. William J. Duffey, pro se. For respondent: Henry E. O'Neill. SHIELDS
SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in and additions to petitioners' income taxes as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)
Sec. 6661
1980
$ 62,614
$ 31,307.00
--  1981
250,127
125,063.50
--  1982
92,117
46,058.50
$ 9,211.70
The issues are: (1) Whether respondent violated petitioners' right to equal protection under the Constitution of the United States; (2) whether respondent's determinations of petitioners' income during the years in dispute are arbitrary and hence not entitled to the usual presumption of correctness; (3) whether petitioners had unreported income as determined by respondent during the years at issue; (4) whether petitioners are liable for additions to tax for fraud under sections 6653(b)[1] or 6653(b)(1); (5) whether petitioners are liable for the addition to tax for a substantial understatement as provided in section 6661 for 1982; and (6) whether the assessment of the deficiencies in and additions to tax due from petitioners is barred by the *190 statute of limitations. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by reference. Prior to the conviction and incarceration of William J. Duffey, as hereinafter set out, both petitioners were residents of Mililani, Hawaii. However, at the time that the petition in this case was filed, Mr. Duffey was incarcerated at the La Tuna Federal Correctional Institution at Anthony, New Mexico-Texas, but Mrs. Duffey still resided at Mililani. For the years 1980, 1981, and 1982, they filed joint income tax returns with respondent. 1. General Background
In 1973, William J. Duffey retired after 23 years of service from the United States Air Force at the rank of lieutenant colonel. After retirement he moved to Pearl City, Hawaii, which is on the island *191 of Oahu, and in 1974 started working as a bartender. While employed as a bartender, he met Freida Duffey, who was employed by a Consolidated Package Store. They were married in 1978; it was his third marriage and her second. In 1980 they bought and moved to a house in Mililani, which is also on the island of Oahu. At about the date of their marriage, Mr. Duffey began working as the office manager for a law firm whose senior partner, Gary Altman, and his wife had been close personal friends of petitioners since about 1974. The law firm's offices were in Hilo, which is on the island of Hawaii. Because of his friendship with the Altmans and to avoid the daily travel between Oahu and Hawaii, Mr. Duffey spent each weekend bartending in Mililani and returned to his job as office manager on Monday and spent the week nights at the Altman home. Gary Altman, who testified that he specializes in business law, tax law, and estate planning, served as petitioners' attorney in setting up several trusts including the Mai Tai Trust and with respect to certain other transactions during the years under consideration. He also signed petitioners' returns for 1980, 1981, and 1982 as the preparer, *192 but at trial testified that some other unnamed individual or individuals in his firm actually prepared such returns "from client tax information schedules" submitted by petitioners. The petition herein was filed on behalf of petitioners by Mr. Altman and he served as their counsel in this case until July 21, 1988, when respondent's motion to disqualify him as counsel was granted because he was likely to be a necessary witness. See Duffey v. Commissioner, 91 T.C. 81 (1988). 2. Drug Dealing Activities of Petitioners
On September 7, 1982, a search made of petitioners' residence pursuant to a search warrant, resulted in the seizure of a small amount of valium, several tablets of methaqualone (quaaludes), loose marijuana, a number of marijuana plants, and eight packets of cocaine. On October 28, 1983, an indictment containing 30 counts was returned to the United States District Court for the District of Hawaii in which petitioners and David J. Gore, Falefasa Silipa, Ray Sciacca, William Taveres, Anthony Flores, Toagamalu Brown, Claude Wells, Brian Peroff, Frank De Frank, Richard Avilla, and Jesse W. Baker were indicted for conspiring to distribute *193 marijuana and methaqualone; possessing, and possessing with the intent to distribute, and for distributing marijuana and methaqualone; interstate travel to promote an unlawful activity; false declarations before a Federal grand jury; and engaging in a continuing criminal enterprise. At the conclusion of a jury trial which began in the aforesaid United States District Court on July 31, 1984, Mr. Duffey was convicted on 12 of the 30 counts in the indictment which included specific offenses as follows: Count 4: That on or about 2/7/80 in the District of Hawaii and elsewhere the defendant William Duffey distributed approximately 21 pounds of marijuana. Count 9: That on or about 10/29/80 in the District of Hawaii and elsewhere the defendant William Duffey, Sciacca and De Frank traveled in interstate commerce, from Florida to Hawaii, to promote and carry on an illegal enterprise, namely the possession and distribution of methaqualone and marijuana; thereafter Duffey, Sciacca and de Frank promoted and carried on this unlawful activity. Count 10: That on or about 10/29/80 in the District of Hawaii William Duffey, Wells, Sciacca and De Frank possessed with intent to *194 distribute approximately 40,000 tablets of methaqualone. Count 15: That on or about March 1981 in the District of Hawaii Duffey distributed approximately 1,000 tablets of methaqualone. Count 16: That on or about May 1981 in the District of Hawaii Duffey distributed approximately 1,000 tablets of methaqualone. Count 17: That on or about 6/3/81 in the District of Hawaii Duffey distributed approximately 2,000 tablets of methaqualone. Count 18: That on or about July 1981 in the District of Hawaii Duffey distributed approximately 2,000 tablets of methaqualone. Count 19: That on or about July 1981 in the District of Hawaii Duffey distributed 4,000 tablets of methaqualone. Count 20: That on or about 8/7/81 in the District of Hawaii Duffey distributed approximately 3,000 tablets of methaqualone. Count 21: That on or about August 1981 in the District of Hawaii Duffey and Silipa distributed 4,000 tablets of methaqualone. Count 24: That on or about 9/7/82 at Mililani in the District of Hawaii defendant William Duffey possessed a quantity of methaqualone powder. Count 30: That during a period from in or about the fall of 1977 and *195 continuously thereafter, up to and including the date of the bringing of the indictment [October 28, 1983], William Duffey engaged in a continuing criminal enterprise, i.e., a conspiracy to distribute controlled substance (marijuana and methaqualone) and from this conspiracy gained substantial income and resources in excess of $ 1,000,000.
In the same trial, Mrs. Duffey was convicted of the following: Count 1: That from about the fall of 1978 and up to and including the date of the indictment [October 28, 1983], Frieda Duffey and others conspired to possess and distribute methaqualone and as part of said conspiracy derived income in excess of approximately $ 1,000,000. Count 26: That on or about 9/1/83 before the Federal Grand Jury in the District of Hawaii Frieda Duffey made a false material statement related to possession of safety deposit boxes. Count 28: That on or about 9/1/83 before the Federal Grand Jury in the District of Hawaii Frieda Duffey made a false material statement related to Harry Goodman visiting her home.
On appeal, petitioners' convictions were affirmed without a written opinion by the United States Court of Appeals for the Ninth *196 Circuit. In spite of their convictions on the above counts, petitioners in this proceeding deny that they were involved in and derived any income from, the sale of controlled substances during the years 1980 through 1982. However, at the trial of this matter they stipulated into the record a presentence report prepared after their criminal trial by a senior probation officer for the District Court. In pertinent part, the presentence report contains the following summary of the activities of petitioners and the other defendants from 1978 through 1984 as disclosed by the record in the criminal case: The investigation into this case was conducted jointly by the State Investigation and Narcotics Control Section (INCS) and the Drug Enforcement Administration (DEA). The investigation reflects the following information: In approximately the Fall of 1977 Harry Goodman, the owner of a company identified as Hawaii Discount Tools, was involved in the distribution of Hawaii grown marijuana on the mainland. Assisting him in this illicit business was Bradley Friedman. During the course of this operation in approximately 1978, Freidman introduced Goodman to William Duffey, a retired Air Force *197 lieutenant colonel. Friedman felt that Duffey could provide his business expertise to the marijuana operation. Sometime in 1978 Friedman and Goodman decided to become involved in the distribution of methaqualone (Quaaludes). Sometime between September and October of 1978 Goodman showed Friedman approximately 20,000 Quaaludes in Los Angeles. Because the Quaaludes were of an inferior quality Friedman advised he could not distribute the tablets in Los Angeles. Goodman subsequently traveled to Hawaii and was reportedly able to distribute the 20,000 Quaaludes within a week. Between September and October 1978 Goodman recruited John Adams in Hawaii to assist in the distribution of Quaaludes in this State. At some point during the latter part of 1978 William Duffey and his wife, Frieda Duffey, also became involved in large-scale distribution of Quaaludes in Hawaii. Between February and March of 1979 Goodman and Friedman traveled to New York City, New York and Miami, Florida to purchase large quantities of Quaaludes from their source, identified as Frank De Frank, also known as Frank Marchese. In March 1979 defendant William Duffey's mother and stepfather, identified as Lilah and *198 William Connor visited William and Frieda Duffey at their residence during that period located at 1478 Hooli Circle in Pearl City. The mother was so disturbed by Duffey's drug use and distribution activities that she subsequently reported her son and daughter-in-law's activities to authorities. She later testified before the Federal Grand Jury and also for the prosecution during the course of his Federal trial. In part, Mrs. Connor testified that during the three weeks she stayed in Pearl City, during March 1979, from the early evening onwards people would come to the door, William Duffey would then go to the refrigerator and deliver bags to the visitors. On one occasion he dropped $ 600 in cash in Mrs. Connor's lap and said "that's how fast you can make money here." Mrs. Connor later inspected the refrigerator and found bags (which were constantly replenished) to contain large numbers of Quaaludes tablets. Although she did not know what specific drug they were at the time, her description indicated that they were, in fact, Quaaludes. The visitors arrived throughout the evening continuing on sometimes after midnight. On occasion, Freida Duffey made the deliveries to the door. *199 Mrs. Connor further stated that on some occasions she overheard activity in the back bedroom which sounded to her as if Duffey was measuring pills on a calibrated scale (which she later saw). Mrs. Connor was also present in the home when Harry Goodman visited on several occasions apparently to deliver Quaaludes or to pick up cash. According to Mrs. Connor there is evidence to indicate that both William and Frieda Duffey were smoking marijuana. She reported that William Duffey carried both a container of marijuana and Quaaludes with him. On several occasions Mrs. Connor stated that she accompanied William Duffey to visit an individual identified to her only as "Uncle Toma". Duffey would pick up from Uncle Toma large bags which she stated contained Quaaludes. Just prior to a brief trip to Hilo, Frieda and William Duffey delivered large bags to uncle Toma. Authorities believe that Uncle Toma's residence was used by Duffey as a "stash pad"; a location where drugs could be safely stored. "Uncle Toma" was later identified as being Tomas Cablay of Aiea. When questioned he admitted knowing the Duffeys but denied participating in illegal activity with them. Also, during March of *200 1979 Mrs. Connor and her husband flew to Hilo with William and Frieda Duffey, staying at the home of attorney Gary Altman. Duffey had been employed as manager of Altman's Hilo law offices. While at the Altman residence Duffey made a statement that he was "going harvesting". He later returned to the residence with a large bag containing marijuana that he brought with him when they returned to Honolulu. Duffey also advised his mother that Altman helped him conceal approximately $ 250,000 in income. Mrs. Connor further testified that she, on one occasion, saw stacks of money "two or three inches high" of fifty and one hundred dollar bills in United States currency. This cash was located in Frieda Duffey's dresser. In approximately February 1980 William Duffey and others caused twenty pounds of marijuana to be shipped to Los Angeles. On approximately 2/26/80 Harry Goodman was arrested in Las Vegas for Distribution of Marijuana from Hawaii to California. Following Goodman's arrest in Las Vegas William Duffey took over the supervision and management of the distribution of Quaaludes in Hawaii. Major distributors in Honolulu who had previously been supplied by Goodman received the *201 drug instead from Duffey. Goodman died, apparently of natural causes, in October of 1980 in the Los Angeles area. Following Goodman's death, Duffey not only handled the management and distribution of Quaaludes in Hawaii but he also took over the importation of Quaaludes from Florida. He had previously met Goodman's Quaalude source, De Frank, in Florida during at least one prior trip with Goodman to that state. During the early stages of Duffey's importation operation he was assisted by Bradley Friedman. Friedman subsequently made one additional trip to Florida on behalf of Duffey. Friedman's responsibility was to verify the quality of the Quaaludes and to deliver them directly to Duffey or a designated associate of Duffey's. On 10/25/80 Duffey gave Friedman $ 60,000 and instructed him to take the money to Florida to purchase approximately 40,000 Quaaludes from De Frank. Friedman traveled to Los Angeles where he met a friend, identified as Roy Sciacca, and together they flew to Florida where they were met by Duffey and De Frank on approximately 10/28/80. On approximately 10/29/80 Friedman and Sciacca delivered the 40,000 Quaaludes they had received in Florida to a close associate *202 of Duffey's in Honolulu, identified as Claude Emil "Chuck" Wells. In addition to Friedman, Duffey also used Jesse Baker and Toagamalu "Lea" Brown to transport Quaaludes from Florida to Hawaii. Duffey had a network of his own independent distributors and, following the death of Goodman, assumed some of Goodman's distributors. One of the larger scale distributors was John Adams who, after meeting Duffey in 1979 or 1980, began to pick up the Quaaludes directly from Duffey at his home. On occasion, Duffey or one of his subordinates would also deliver directly to Adams at Adams' business. * * * In late 1980 John Adams decided to cease selling Quaaludes to Brian Peroff because Adams could no longer tolerate Peroff's behavior. Peroff was reported to be a heavy drug user. Adams advised Duffey of this decision but because Duffey did not want to lose Peroff's considerable business he introduced Adams to Gore. Gore advised Adams that he would take over Peroff's business and use Anthony "Tubby" Flores as a go-between or runner of Quaaludes. Flores also played, this role to other sub-distributors. An arrangement was made wherein Duffey credited to Adams $ .25 for every Quaalude sold *203 to Peroff through Gore. Eventually Falefasa Silipa took over the role of courier to Peroff until it was decided that they no longer wished to deal with Peroff either. At that point Adams reassumed distribution to Peroff. * * * Between 7/24/80 until February 1981 Duffey rented an apartment located at 98-450 Koauka Loop #1401 in Aiea. Duffey and his couriers used this apartment as a "stash pad" for the storage of drugs. Duffey also kept large quantities of drugs at various periods in his own residence located at 94-506 Eeka Place, Mililani. He and his wife moved into this residence which they purchased in June or July of 1980. After being forced to leave Honolulu, Friedman on one more occasion went to Florida to purchase Quaaludes from De Frank. On 1/29/81 Friedman was arrested in Los Angeles in possession of 16,000 Quaaludes. After hearing of his arrest Duffey reportedly stated that De Frank was no longer safe to deal with. It is believed, however, that he continued to purchase from De Frank but used additional precautions. The defendant's mother, Lilah Connor, testified that sometime after Christmas in 1980 Duffey arrived at her house in Olympia, Washington apparently *204 heavily under the influence of drugs. He withdrew two packets of one hundred dollar bills from a knapsack and told her the knapsack contained approximately one-quarter of a million dollars. Authorities believe that this trip occurred in February 1981 and that Duffey was en route to Florida to make his new purchasing arrangements. On 12/9/81 Jesse Baker was arrested at Los Angeles International Airport in possession of 17 1/2 Quaalude tablets and approximately $ 14,800 in United States currency. He was suspected to be traveling to Florida with Quaalude samples with the intent of buying Quaaludes for Duffey. He was traveling under the name "L. Brown". He also carried a ticket in the name of "Bill Duffey". His travel was in a "segmented" fashion in that he used a different name for each leg of his journey to avoid detection. He carried a suitcase fitted for the transportation of Quaaludes. The cash was seized by law enforcement authorities. However, $ 7,400 was later returned. Following Baker's arrest, Duffey was said to have ceased importing Quaaludes to Hawaii. * * * John Adams was arrested on 7/30/82 after selling 1,000 Quaaludes to an INCS agent. He chose, as did others, *205 to cooperate in the investigation of the Duffeys. On 9/7/82, based upon corroborative statements made by Adams, a Search Warrant was executed at the Duffey residence at 94-506 Eeka Place, Mililani. During the course of the search small amounts of Valium, Quaaludes, loose marijuana and an unspecified number of marijuana plants as well as eight small packets of cocaine were seized. In addition, agents seized a triple beam scale, a Colt .38 revolver and seven hollow point bullets. Extensive documents and records, which were later analyzed, were also seized. * * * On 11/8/82 Bradley Friedman was arrested as he attempted to sell 3,000 Quaaludes to Adams. He also chose to cooperate. Based on the records seized from Duffey, the tracing of activities of various conspirators and the debriefing of numerous cooperating individuals, investigators were able to identify many of the salient points of this on-going criminal enterprise. Narcotics authorities believe that the Duffey organization was responsible for the distribution of 1.5 million Quaalude tablets during its period of activity from late 1979 to December 1981. These tablets wholesale for between $ 2.00 and $ 2.75 and are sold *206 on the street for a minimum of $ 5.00. As early as shortly after the death of Goodman in October 1980 Duffey boasted that he was distributing 80,000 Quaalude tablets a month. He later showed Friedman records to corroborate these claims. In fact, in December 1980 Duffey held a dinner at the John Dominis Restaurant in Honolulu which was attended by John Adams, Claude Wells and others. The purpose of this party was to celebrate Duffey having made a million dollars in the drug business. Some of the money Duffey made in the drug distribution business was invested in loans to other parties and real estate. He and Harry Goodman hired a contractor identified as David Dietrich to build three homes for them on the Big Island. These homes were subsequently sold for at least $ 100,000 each. Attached to all copies of this report are pages 26 through 29 of the Indictment showing assets narcotics authorities feel were purchased with illegal drug revenues. Following the jury trial in this case the items previously named in the Offense Section of this report were Ordered forfeited. Much of the assets gained in the criminal enterprise had been laundered through trusts set up for that purpose. *207 These trusts include the Mai Tai trust and the Harrill Trust. Additionally the April Trust was believed to contain drug money which was designated for Goodman's granddaughter. As previously noted, the subject [William Duffey] had advised his mother and others that he was assisted in his financial dealings by attorney Gary Altman who Duffey claimed had helped him conceal $ 250,000 in income as early as March 1979. He also assisted in making the trusts. During the course of the investigation into this case, on 9/1/83, Frieda Duffey was called before the Federal Grand Jury in Honolulu. At that time she asserted having had only one safety deposit box which was located at the Pearl City Branch of Hawaii. In fact, she and William Duffey, at various times, between 1980 and 1981 maintained as many as three separate boxes (Count 26 of the Indictment). Frieda Duffey also testified that she knew nothing about the April Trust, including the fact that she was a trustee of that trust. In fact, she knew that she was a trustee and had acted on behalf of the trust (Count 27 of the Indictment). Finally, Frieda Duffey testified that Harry Goodman had never come to the Duffey residence in Pearl *208 City when, in fact, she knew that he had (Count 28). She was charged subsequently with Making False Material Statements before the Federal Grand Jury as a result of her statements. William Duffey was arrested on 11/2/83 and held in custody until release on 12/9/83 on $ 250,000 with a ten percent deposit bond. Frieda Duffey was arrested on 11/2/83 and released on 11/3/83 after $ 10,000 cash bond was posted. Defendant's Version
On the advice of counsel the defendants refused to comment on any aspect of this case.
From the aforesaid convictions and report it is apparent, and we so find, that petitioners were extensively engaged in the illegal purchase and sale of controlled substances, particularly marijuana and methaqualone, during the years 1980 through 1982. 3. Petitioners' Income Tax Returns
In an application for a loan assumption with the Pulaski Federal Savings & Loan Association, Mr. Duffey reported he owned the following assets on July 3, 1974:
Cash (deposited in The Bank, Plattsburgh, N.Y. Bank)
$    125.00
Savings Account (at Plattsburgh AFB Credit Union)
6,124.60
Cash Value of Life Insurance * * *
10,000.00
U.S. Savings Bonds (Cash Value)
675.00
Stocks and Other Securities
Furniture and Other Household Goods (Resale Value)
4,000.00
Automobile 1. Buick GS Year 1972 Make
Grand Sport * * *
3,000.00
Real Estate (Approximate Market Value) Lot P,
Fairfield Bay, Ark.
11,000.00
Equity-Lakewood Hills Condominium #117, Bldg 10
5,500.00
Other Assets Snowmobile, Trailer & Camper
900.00
Checking Account, National Bank of Ft. Sam
Houston
700.00
TOTAL ASSETS
$ 42,024.60
*209 In the same application, he also represented that his income at that time consisted of $ 876.14 per month in retirement income from the United States Air Force. Petitioners filed joint Federal income tax returns for the years 1979 through 1982. In the return for 1979, the year before the years at issue, they reported income as follows: (1) Wages, salaries, tips, etc. of $ 30,781; (2) interest income of $ 185; (3) a capital gain of $ 3,855; (4) a loss from the rental of property in the amount of $ 2,822; and (5) unemployment compensation of $ 2,180. For the years at issue, petitioners reported no income from the sale of controlled substances. They reported income and losses from the activities and in the amounts set forth below: 1980  1981  1982  Wages, salaries, tips, etc.
$ 12,148 $ 38,062 $ 13,017 Interest income
268 1,161 1,165 Dividends
142 30 -- Refunds of State and local
income taxes
-- 745 -- Capital gain or (loss)
(3,000)
1,764 -- Fully taxable pensions and
annuities
23,508 -- 27,896 Pensions, annuities, rents,
royalties, partnerships
(11,323)
(17,229)
(15,557)
4. Respondent's Determinations
Respondent *210 conducted an examination of petitioners' income tax returns for 1980 through 1982 following their convictions in the drug case described hereinbefore. After the audit, respondent concluded: (1) That during such years petitioners failed to maintain complete and accurate records of their income and expense; and (2) that petitioners' taxable income for such years could not be determined from their records. With these findings, respondent proceeded to determine petitioners' taxable income for each of the years 1980, 1981, and 1982 by reference to their increases in net worth plus personal expenditures. In calculating petitioners' taxable income by this method, which is sometimes referred to as the net worth or the net worth plus personal expenditures method of proof, respondent first calculated petitioners' net worth as of the end of 1979 and each of the years in issue. That calculation yielded the following results: Year Ended
12/31/79
12/31/80
12/31/81
12/31/82
Assets:
Cash on hand
--  --  --  --  Cash in bank
$ 8,685 $ 15,642 $ 23,428 $ 18,597 Notes receivable
10,000 288,000 468,500 Automobiles
9,747 8,060 35,215 30,215 Art
--  --  24,253 24,253 Investments
--  --  5,600 6,700 Jewelry
--  --  30,650 30,650 Life insurance
--  --  9,000 9,000 Real estate
27,999 182,557 339,829 338,171 Harrill Trust
125,182 163,924 TOTAL ASSETS
46,431 216,259 881,157 1,090,010 Liabilities:
Loans payable
6,006 4,714 39,086 44,442 Mortgages payable
12,189 91,861 237,818 249,344 TOTAL LIABILITIES
18,195 96,575 276,904 293,786 Net Worth
28,236 119,684 604,253 796,224 *211 Respondent next determined the increase in petitioners' net worth for each of the years 1980, 1981, and 1982 as follows: Net worth at
Increase in net
Year
December 31
worth during year
1979
$ 28,236
--  1980
119,684
$ 91,448
1981
600,253
480,569
1982
798,224
197,971
From the records available, respondent then determined for each of the years in dispute, petitioners' personal and nondeductible expenditures, nontaxable receipts, and allowable deductions, and with these figures proceeded to compute the amounts by which petitioners' taxable income for each year was understated in the following manner: 1980
1981
1982
Increase in net
worth
$ 91,448
$ 480,569
$ 197,971
Add: personal &
nondeductible
expenditures
60,205
55,947
47,838
Total
151,653
536,516
245,809
Less: nontaxable
receipts
189
1,358
--  Allowable
deductions
8,811
23,597
39,083
Correct taxable
income
142,653
511,561
206,726
Less: taxable
income per return
14,263
952
12,909
Understatement
128,390
510,609
193,817
Finally, respondent determined deficiencies in petitioners' income tax for the years in dispute and mailed a notice of such deficiencies to petitioners *212 on April 23, 1986. The deficiencies determined by respondent are as follows: 1980 1981 1982 Correct income tax
$ 64,138
$ 250,127
$ 93,508
Tax liability reported
1,524
--  1,391
Deficiency
62,614
250,127
92,117
In the deficiency notice, respondent also determined (1) that petitioners are liable under sections 6653(b) or 6653(b)(1) for additions to tax for fraud in each of the years 1980 through 1982, and (2) that petitioners are liable for an addition to tax under section 6661 for a substantial understatement with respect to 1982. 5. History of the Case in this Court and Evidentiary Questions
In their petition, which was filed on July 15, 1986, petitioners generally assert that the deficiencies in and additions to tax determined by respondent are not supported by the relevant facts and that the assessment of any deficiencies in tax or additions to tax is barred by the statute of limitations. In her answer, respondent denies petitioners' assertion that the relevant facts do not support the determinations in the deficiency notice and asserts that an assessment of the deficiencies in and additions to tax is not barred by the statute of limitations *213 under section 6501(c)(1) (fraudulent returns) or section 6501(e)(1) (25-percent understatement of gross income). Prior to trial, the parties filed a series of motions and objections thereto in order to determine which documents should be stipulated in this case. Finally, an order was entered on February 7, 1990, in which the bulk of the exhibits that respondent sought to have admitted into the record were deemed stipulated. Petitioners abandoned their objections with respect to the balance of respondent's exhibits during the course of the trial. Prior to trial, respondent filed a motion for leave to introduce into the record the testimony of Lilah Connor, Mr. Duffey's mother, in the criminal trial of petitioners as an unavailable witness under rule 804 of the Federal Rules of Evidence. After considering petitioners' objection, we concluded that Mrs. Connor was an unavailable witness due to her advanced age, bad health, and the distance she would have to travel from her place of residence to the place of trial. Consequently, her testimony from the prior trial was admitted. However, petitioners continued to contend that the admission of her testimony was in error and it should *214 not be considered here. Finally, in order to rebut respondent's allegation that the Duffeys had fabricated their testimony in this case regarding a cash hoard, petitioners attempted to introduce Mr. Duffey's deposition testimony from an unrelated civil lawsuit. The deposition was taken on June 13, 1983, prior to petitioners' criminal trial or these tax proceedings. We reserved a ruling on respondent's hearsay objection to this testimony, and the parties were directed to submit arguments on brief with respect to the admissibility of the deposition. OPINION 1. Constitutional Question
Petitioners contend that they have been the subject of selective prosecution in this case by respondent and that such action violates their constitutional guarantee of equal protection under the law. [2] Respondent counters that the standards applicable to claims of selective prosecution in criminal cases do not apply to civil tax cases; that even if those standards do apply petitioners have failed to make out a case of selective prosecution; and that since proceedings in this Court are de novo, respondent's motivation for issuing a deficiency notice is not relevant to a proper determination *215 of a taxpayer's liability. While respondent's motivations or the evidence used by respondent in deciding whether to issue a deficiency notice will not generally be considered by this Court, exceptions have been made where it is found that "there is substantial evidence *216 of unconstitutional conduct on respondent's part and the integrity of our judicial process would be impugned if we were to let respondent benefit from such conduct." Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 328 (1974). In order to support a claim of selective prosecution in a criminal tax case, a party must establish that the Government's action had a discriminatory effect and was motivated by a discriminatory purpose. Wayte v. United States, 470 U.S. 598, 608 (1985). In the context of criminal cases, this means that a defendant must show: "(1) The decision to prosecute was based on impermissible grounds such as race, religion, or the exercise of constitutional rights; and (2) that others similarly situated are generally not prosecuted." Church of Scientology of California v. Commissioner, 83 T.C. 381, 448 (1984) (citing Karme v. Commissioner, 673 F.2d 1062, 1064 (9th Cir. 1982), affg. 73 T.C. 1163 (1980); United States v. Ness, 652 F.2d 890, 892 (9th Cir. 1981), cert. denied 454 U.S. 1126 (1981); *217 United States v. Moon, 718 F.2d 1210 (2d Cir. 1983), cert. denied 466 U.S. 971 (1984)), affd. 823 F.2d 1310 (9th Cir. 1987). Both the Court of Appeals for the Ninth Circuit and this Court have used the two-prong test described above in civil tax cases, while expressing doubts as to its applicability. In each such case, the Court ultimately concluded that the taxpayers involved had failed to establish that they were improperly selected for prosecution. See St. German of Alaska E. Orthodox Catholic Church v. United States, 840 F.2d 1087, 1095 (2d Cir. 1988); Karme v. Commissioner, supra at 1064; Church of Scientology of California v. Commissioner, supra at 448-449. Here again, we have serious doubts about the applicability of the test, but conclude that even if applicable, petitioners have failed to establish that respondent's action in this case constitutes selective prosecution. Their only evidence in support of this claim was that John Adams, a participant in petitioners' drug distribution activity, *218 was neither audited nor issued a deficiency notice. Mr. Adams testified at trial that respondent had neither audited him nor attempted to assess any additional income taxes against him. Petitioners, therefore, seek to limit the class of similarly situated taxpayers to those who were involved in the same drug dealing activities in which they participated. In other words, they apparently contend that unless respondent seeks additional taxes from all of the participants in the same drug dealing activities, petitioners have been unfairly singled out in violation of their guarantee of equal protection. Respondent contends that the class of similarly situated taxpayers should at the least include the innumerable individuals against whom respondent has determined deficiencies based upon unreported profits from illegal sales of drugs. We agree with respondent. Moreover, the record before us does not contain any evidence, or even an allegation, that respondent proceeded against petitioners because they were members of any particular racial or religious group. Consequently, we conclude that petitioners have failed to establish that they were subjected to selective prosecution by respondent *219 in violation of their constitutional rights. 2. Presumption of Correctness
Petitioners also argue that respondent's determination of deficiencies is so arbitrary and erroneous that the presumption of correctness that normally attaches to such determinations is destroyed. Respondent contends that the presumption is applicable because the record contains an evidentiary basis for each element in the net worth computation. In general, respondent's determination of a deficiency in a civil case as opposed to a criminal case is entitled to a presumption of correctness. Welch v. Helvering, 290 U.S. 111 (1933); Bernuth v. Commissioner, 470 F.2d 710, 714 (2d Cir. 1972), affg. 57 T.C. 225 (1971). The presumption constitutes a procedural device that places the burden of producing evidence to rebut respondent's determination on the taxpayer. Portillo v. Commissioner, 932 F.2d 1128, 1133 (5th Cir. 1991), affg. in part, revg. in part and remanding T.C. Memo. 1990-68. However, if the taxpayer is able to show that the deficiency notice is *220 arbitrary, capricious, or without reasonable foundation, the burden of going forward with the proof may shift to respondent. Helvering v. Taylor, 293 U.S. 507 (1935); Portillo v. Commissioner, supra at 1133; Dellacroce v. Commissioner, 83 T.C. 269, 287 (1984); Riland v. Commissioner, 79 T.C. 185, 201 (1982); Jackson v. Commissioner, 73 T.C. 394, 401 (1979). As a general rule, we will not look behind a deficiency notice to examine the evidence used by respondent in making a deficiency determination since our trials are de novo and our redetermination of a taxpayer's liability is based upon the record presented to us. Jackson v. Commissioner, supra at 400 (citing Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324 (1974)). However, we have on occasion recognized the difficulty of proving a negative, i.e., the nonreceipt of income, and looked behind the notice of deficiency in cases involving alleged unreported income from an illegal activity where respondent *221 rests on the presumption of correctness without introducing substantive evidence of income-producing activities. Portillo v. Commissioner, supra at 1133-1134; see also Cozzi v. Commissioner, 88 T.C. 435, 444 (1987); Dellacroce v. Commissioner, 83 T.C. 269, 280 (1984). The present case does not fall within the exception found in the above cases because here respondent has done a great deal more than rely upon the presumption of correctness. She has placed in the record, as set forth in our findings, the indictments returned against petitioners in which they were charged with numerous instances of illegally dealing in drugs; copies of their convictions on a number of those charges; copies of their tax returns and other financial records during the years in issue; and a detailed net-worth-personal-expenditure calculation which in sum clearly establishes that they realized substantially more income during the period than was reported on their returns. Furthermore, respondent has produced evidence clearly linking petitioners to illegal income-producing activities during the years under *222 consideration. We conclude, therefore, that this case does not warrant a finding that the deficiency determinations of respondent are not entitled to the usual presumption of correctness. 3. Unreported Income
As noted hereinbefore, respondent determined that petitioners' books and records were inadequate and reconstructed their income for 1980, 1981, and 1982 by use of the net worth plus personal expenditures method. A deficiency determined by respondent by the use of such method is prima facie correct unless shown by the taxpayer to be erroneous. Rule 142(a); United States v. Massei, 355 U.S. 595 (1958); Smith v. Commissioner, 91 T.C. 1049, 1059 (1988), affd. 926 F.2d 1470 (6th Cir. 1991); Brooks v. Commissioner, 82 T.C. 413, 431 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). Petitioners deny that they failed to maintain adequate records of their income and expenses. However, at trial they did not produce any records. We conclude, therefore, that their records, if any, were inadequate. [3]Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), *223 affd. 162 F.2d 513 (10th Cir. 1947). Where a taxpayer's books and records do not clearly reflect his or her income, respondent is authorized by section 446(b) to reconstruct the taxpayer's income by any acceptable means. The net worth method used by respondent in this case is an acceptable means of proving income even though its use requires the *224 exercise of "great care and restraint". Holland v. United States, 348 U.S. 121, 129 (1954). For instance, respondent must establish the opening net worth with reasonable certainty. Moreover, she must either show that a likely source of unreported income existed or, in the alternative, that a reasonable investigation of leads has been conducted in order to negate the existence of nontaxable sources of income. However, respondent does not have to negate possible sources of nontaxable income if she clearly proves, as here, the existence of a likely source of unreported income. United States v. Chu, 779 F.2d 356, 366 (7th Cir. 1985); United States v. Mastropieri, 685 F.2d 776, 784-785 (2d Cir. 1982); Petzoldt v. Commissioner, 92 T.C. 661, 696 (1989). We have already found in the present case that respondent has produced evidence of a likely source of unreported income for petitioners in the years in issue through the introduction of their convictions with respect to extensive dealings in drugs. In fact, petitioners are estopped by such criminal convictions *225 to deny that they trafficked in drugs. Considine v. United States, 683 F.2d 1285, 1286 (9th Cir. 1982). In an attempt to establish that respondent's net worth computation is incorrect, petitioners challenge both respondent's overall calculation as well as specific items within the analysis. First, to refute respondent's computation of taxable income, petitioners rely on a hypothetical calculation of the maximum amount of income which they contend could have been realized by them from the sale of all of the drugs attributed to them during their criminal trial. In other words, petitioners attempt to prove that their maximum income from the drug activity had to be considerably less than respondent's calculation of omitted income by reference to the number of units of drugs that they were convicted of possessing or distributing in the criminal trial. By multiplying the number of such units by an assumed sales price per unit and deducting assumed costs and sales expenses per unit, petitioners arrive at a total net income figure which is a great deal less than the understatements of taxable income determined by respondent. We find that petitioners' calculation *226 is worthless. First, and most important, the calculation assumes without proof that the only drugs sold by petitioners were those that they were convicted in the criminal case of possessing or distributing. Secondly, it is based upon assumed sales prices, costs, and selling expenses for which there is no creditable proof in the record that such prices, costs, and expenses were received or incurred by petitioners. Finally, petitioners' calculation is apparently based at least in part upon statements appearing in the presentence report in the criminal case to the effect that quaalude tablets "wholesale for between $ 2.00 and $ 2.75 and are sold on the street for a minimum of $ 5.00." By reference to the complete paragraph [4] in the report from which petitioners' assumed sales prices, costs, and expenses were taken, a reasonable conclusion could be reached that during the 3 years under consideration petitioners distributed approximately 2,250,000 [5] quaalude tablets which cost them at the most $ 2.75 per tablet for a total cost of $ 6,187,500 and received $ 5 per tablet for a total income of $ 11,250,000. If it is assumed that as much as 50 percent of the total received was paid *227 out by petitioners as costs and other expenses, the net would be over $ 5 million from the sale of quaaludes alone. It is noted that $ 5 million is about seven times as much as the total understatement of income determined by respondent for the 3 years from the sale by petitioners of both quaaludes and marijuana. *228 Petitioners also challenge several items in respondent's net worth computation. While we have carefully considered all of petitioners' arguments, we find that most of them are based solely upon their own unsubstantiated testimony or the unsubstantiated testimony of Mr. or Mrs. Altman. In the absence of corroborating evidence we are unable to make findings based solely upon this testimony because of contradictions which appear between such testimony and prior statements both orally and in writing made by one or both of petitioners. An example of many such contradictions is petitioners' testimony at trial with regard to the cost of jewelry included in respondent's net worth computations at December 31, 1981, and December 31, 1982. Respondent's figure of $ 30,650 for the cost of the jewelry was obtained by respondent from a document that petitioners had prepared during the years in issue. Petitioners claim that the figures used by them in the previous document were "self-serving" and "overinflated". Another example is the obviously contrived and unbelievable explanations offered by both Mr. Duffey and Mr. Altman regarding numerous figures appearing in respondent's computation. *229 With such contradictions and unbelievable testimony, especially in view of petitioners' continued denial of any participation in drug activities even after their convictions in the criminal trial in which Mrs. Duffey was convicted of making false material statements to the grand jury, we are unable to base any finding solely upon such testimony. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Therefore, we will limit our discussion to the questions raised by petitioners with respect to items in the net worth computation for which the record contains some evidence in addition to petitioners' testimony or the testimony of the Altmans. (A) Cash on Hand Where, as in this case, respondent's determination of deficiencies is based on a net worth computation, the standards provided in Holland v. United States, 348 U.S. 121, 129 (1954), and United States v. Massei, 355 U.S. 595 (1958), apply. Smith v. Commissioner, 91 T.C. 1049, 1059 (1988), affd. 926 F.2d 1470 (6th Cir. 1991); Brooks v. Commissioner, 82 T.C. 413, 431 (1984), *230 affd. without published opinion 772 F.2d 910 (9th Cir. 1985). One of the standards applicable is that respondent is required to establish the opening net worth of the taxpayer with reasonable certainty. Petitioners contend that respondent has failed to establish their net worth on December 31, 1979, with the necessary certainty because respondent's computation fails to include a substantial cash hoard which Mr. Duffey had accumulated during his service in the Air Force and thereafter from his military retirement pay. In an attempt to support this claim, petitioners elicited testimony from Patricia Altman that she had seen a stack of bills in the Duffeys' home which she estimated to have a total value of about 10 or 11 thousand dollars, and that the Duffeys loaned her money in unstated amounts before the years in issue. Gary Altman also testified that he "believed" that petitioners had a large sum of money available prior to the years in issue, but the maximum amount of cash which he had seen in their possession was ten or eleven thousand dollars. Petitioners also offered the deposition testimony of Mr. Duffey in the previous civil case. Perhaps petitioners' *231 best evidence of a previous cash hoard is Mr. Duffey's deposition testimony from the unrelated lawsuit where he testified on June 3, 1983, that in 1978 he had cash in the approximate amount of $ 200,000 which he used to fund in part the Mai Tai Trust. We have concluded that this testimony should be admitted and considered as part of the record because it is relevant and respondent has failed to convincingly establish that Mr. Duffey had a sufficient motive to fabricate his testimony in the deposition. Furthermore, prior consistent testimony may be admissible despite the existence of a motive to fabricate at the time of the prior testimony. See United States v. Payne, 944 F.2d 1458 (9th Cir. 1991); United States v. Miller, 874 F.2d 1255, 1273 (9th Cir. 1989); United States v. Rohrer, 708 F.2d 429, 433 (9th Cir. 1983). The prior consistent testimony of Mr. Duffey in the previous case is entitled to little weight because his veracity at that time is suspect since the deposition was taken not only after a search of petitioners' residence had disclosed evidence of both marijuana and quaaludes, *232 but also after three of Mr. Duffey's close associates and subsequent codefendants, i.e., Friedman, Baker, and Adams, had been arrested. Under these circumstances, Mr. Duffey in all probability was on notice prior to the date of the deposition that a tax investigation by respondent would probably follow and that a previous cash hoard would be of help. In fact, at trial Mr. Duffey admitted that on the date of the deposition he probably knew that a tax investigation was already underway. Given the weakness of petitioners' evidence, the existence of a cash hoard at December 31, 1979, in the amounts claimed by petitioners cannot be found. Moreover, the claim of a cash hoard was substantially contradicted by other evidence in the record. That evidence includes the application by Mr. Duffey for a loan assumption in 1974 in which he stated he had approximately $ 6,250 in two different banks and a net worth of only about $ 42,000, and the fact that in 1977 they borrowed $ 6,000 to buy a car. With such contradictory evidence and the absence of any proof of substantial earnings being reported on petitioners' returns for 1975 through 1979, it is impossible to conclude that petitioners had *233 accumulated any substantial amount of cash by the end of 1979. In this regard, it is also significant that the record reflects an inability on Mr. Duffey's part to settle on any one amount for the cash on hand at December 31, 1979. When deposed in the unrelated lawsuit he claimed to have funded in part the Mai Tai Trust in 1978 with $ 200,000 in cash; and at one point in the trial herein, Mr. Duffey also claimed he had cash in the amount of $ 200,000 at the end of 1979. However, in the net worth computation introduced at trial, he claims to have had a cash hoard of $ 375,000 at December 31, 1979. Mr. Duffey also was the only witness to testify that petitioners had a large amount of cash in their possession at or near December 31, 1979. [6] Furthermore, even though Mr. Duffey testified that the cash was kept at home, or in a safety deposit box jointly held by him and Mrs. Duffey, she testified that she never saw a large amount of cash in a safety deposit box or at their home. *234 From the record as a whole including the uncorroborated and often confusing and/or contradictory testimony of petitioners and the Altmans, we are unable to conclude that petitioners had a cash hoard which respondent failed to include in the beginning net worth. Petitioners raise one additional argument with respect to cash. They contend that because respondent failed to include any cash in their opening net worth, the opening net worth was not determined with reasonable accuracy. Respondent admits that her computation of petitioners' opening net worth does not include any cash. In fact, the computation does not reflect any cash at the end of each of the 3 years under consideration. From the record as a whole, we are convinced that throughout the years in issue petitioners were engaged in the business of buying and selling drugs, and that by its very nature such a business required them to have some amount of cash on hand at any given time. However, as found hereinbefore, petitioners have failed to prove that they had a cash hoard in excess of the amount usually required to operate their business or that any cash which they had on hand at December 31, 1979, was used to purchase *235 assets which appear in respondent's net worth computation. Therefore, since petitioners have not shown the amount of cash on hand at December 31, 1979, or that any cash on hand at that time was used to acquire assets which appear in respondent's calculations, we conclude that respondent's calculation of petitioners' opening net worth was determined with reasonable certainty. See Estate of Vella v. Commissioner, T.C. Memo. 1982-73, where respondent's computation of petitioner's opening net worth was found to have been determined with reasonable certainty even though it reflected only $ 1,000 in cash on hand, in spite of some evidence tending to indicate that on the date of the opening net worth the taxpayer had in a box $ 35,000 in cash, because "There is no evidence showing that funds from the box were used to purchase any of the assets upon which the net worth increase is based". (B) Automobiles Respondent concedes that the $ 3,000 included in respondent's net worth computation for December 31, 1981, and December 31, 1982, with respect to a 1974 Volkswagen should be $ 1,000. (C) Art Petitioners concede that the art included in respondent's *236 net worth computations for 1981 and 1982 should be $ 25,000 instead of the $ 24,253 shown. However, their contention that the art was received in satisfaction of a note receivable in the amount of $ 25,000 from Frank Dully is not supported by anything in the record other than Mr. Duffey's questionable testimony. Consequently, we are unable to conclude that the note receivable from Mr. Dully should be removed from respondent's computation of notes receivable. (D) Life Insurance Respondent's net worth computations for December 31, 1981, and December 31, 1982, include an insurance policy on the life of Mr. Duffey issued by Prudential Life Insurance Co. with a cash surrender value of $ 5,000. Petitioners contend that this policy was purchased by them and had a cash value of $ 5,000 before 1980. In support of their contention, they point to the fact that the policy appeared at the same value on a list of assets placed in the Mai Tai Trust on July 7, 1980, and in a credit application executed by them on December 3, 1981. Inasmuch as these documents tend to support Mr. Duffey's testimony that the policy was acquired and had a cash value of $ 5,000 prior to the years in issue, we *237 conclude that its cash value should also appear in the net worth computations for December 31, 1979 and 1980. (E) Real Estate and Associated Liabilities Petitioners dispute the inclusion by respondent of two condominiums (University Court #201 and 212) in their net worth for 1981 and 1982. Mr. Duffey testified and petitioners contend that they were merely agents for F & I Real Estate, the owner of these units. In support of this contention, the record also contains a letter dated January 27, 1981, and other documents from Franklin Winkler of F & I Real Estate Holding Co. in which F & I: (1) Promised to resell the units within 30 days after their title was placed in the Mai Tai Trust; (2) guaranteed a minimum price upon their resale; and (3) agreed to pay in the meantime all expenses associated with them, including any payments due on their first and second mortgages. The record also contains a letter dated October 27, 1981, from Mr. Winkler to Mr. Duffey confirming the agreement with regard to the units and spelling out F & I's obligations to make the payments due under the mortgages on the properties, to use its best efforts to sell the properties, and to repay the downpayment *238 and any mortgage payments advanced by Mr. Duffey. In a third letter dated April 4, 1983, Mr. Winkler requested that Mr. Duffey sign an agency agreement so that F & I would be taxed on the sale of the properties. Respondent counters that these documents do not establish an agency relationship, because petitioners made the downpayments on the units, listed them as their own on subsequent financial statements, and in their criminal trial these properties were found to be forfeitable as having been acquired with proceeds from petitioners' illegal drug distribution enterprise. Alternatively, respondent claims that if petitioners are found to have been only agents for F & I, then the amount of the downpayments made by them should be included and the notes payable with respect to the condominiums should be removed from respondent's computation of petitioners' net worth. From the record as a whole, we find that petitioners were acting as agents for F & I with respect to these units. However, we also agree with respondent's alternative position that the downpayments and any mortgage payments made by petitioners during the years under consideration should be included in the net worth computations *239 and the liabilities should be removed. In fact, petitioners concede that if they are found to be only agents with respect to the units, the liabilities should not be left in the net worth computations. (F) Harrill Liabilities and Long-term Capital Gain Petitioners contend that respondent's net worth computations for 1980 and 1981 should include liabilities totaling $ 95,182 of the Harrill Trust. Their explanation for such an increase is so vague, confusing, and unpersuasive that no basis for the adjustment can be found in the record. On their 1981 income tax return, petitioners claimed a long-term capital gain of $ 4,666 from the sale of a house and lot for $ 166,581. Respondent disallowed the treatment of the gain as long term in the absence of proof of the requisite holding period of 1 year. In support of their treatment of the gain, petitioners introduced a State of Hawaii General Excise/Use Tax form. However, this form reflects a sale by petitioners of property in 1980 for $ 189,500. Consequently, we conclude that petitioners have failed to prove that the sale reported by them in 1981 qualifies for treatment as a long-term capital gain. In conclusion, with respect *240 to the deficiencies determined by respondent in petitioners' income tax for 1980, 1981, and 1982 by use of the net worth method, we are satisfied that such determinations are correct with the exception of any reduction in such deficiencies caused by the adjustments to respondent's computations set forth herein. 4. Additions to Tax for Fraud
Section 6653(b) provides that there shall be an addition of 50 percent of any underpayment of tax if any part of the underpayment is due to fraud. Respondent has the burden of proving fraud and must do so with clear and convincing evidence. Sec. 7454; Rule 142(b). In the case of a joint return, in order to establish joint and several liability of both spouses for the addition for fraud, the requisite proof by respondent must be shown with respect to each spouse. Sec. 6653(b). "Fraud is intentional wrongdoing on the part of the taxpayer with a specific intent to avoid a tax known to be owing." Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986) (quoting Conforte v. Commissioner, 692 F.2d 587, 592 (9th Cir. 1982)), affg. T.C. Memo. 1984-601. *241 Thus, in order to prove that an underpayment is due to fraud, respondent must show that the taxpayer intended to evade a tax known to be due by the taxpayer by conduct designed to conceal, mislead, or otherwise prevent the collection of such taxes by respondent. Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148. The existence of fraud is a question of fact to be determined from the entire record. Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980); Stratton v. Commissioner, 54 T.C. 1351 (1970). However, fraud need not be established by direct evidence. It can be shown by an examination of the taxpayer's entire course of conduct and by drawing reasonable inferences from that conduct. Patton v. Commissioner, supra at 171. In determining fraud, the courts have identified certain so-called badges of fraud that are indicative of culpable behavior. These badges include: (1) Understatement of income; (2) inadequate *242 records; (3) implausible or inconsistent explanations of behavior; (4) concealment of assets; (5) failure to cooperate with tax authorities, Bradford v. Commissioner, supra at 307-308; (6) the making of false and inconsistent statements to revenue personnel, Grosshandler v. Commissioner, supra at 20; and (7) the filing of false documents, Stephenson v. Commissioner, 79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984). In arriving at a decision with respect to fraud, we are required to consider the taxpayer's innate ability, education, training, and experience. See Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274; Drobny v. Commissioner, 86 T.C. 1326, 1349 (1986); Iley v. Commissioner, 19 T.C. 631, 635 (1952). As found in the preceding section, petitioners have, with minor exceptions, been unable to overcome the presumption of correctness that attaches to respondent's deficiency determinations. *243 Moreover, respondent has introduced convincing evidence in the form of net worth computations and supporting documents that petitioners substantially understated their income during each of the years in issue. In addition to and in support of the detailed net worth computations respondent has placed in the record voluminous documentary evidence including the following: (1) Bank statements reflecting the yearend balances in petitioners' accounts and the trust accounts under their control; (2) copies of promissory notes made payable to the Mai Tai Trust; (3) copies of retail installment agreements, promissory notes and security agreements, certificates of title, and motor vehicle purchase orders showing petitioners' purchase and the cost of automobiles; (4) a loan application for the purchase of art and checks made payable to galleries or containing notations that the funds were being used to acquire art; (5) subscription agreements, receipts for invested funds, articles of incorporation, and copies of checks showing petitioners' investments; (6) financial statements and a copy of a schedule of property transferred by petitioners to the Mai Tai Trust including a list of petitioners' *244 jewelry; (7) a schedule of insurance policies and their cash surrender values transferred to the Mai Tai Trust; (8) loan applications and other financial statements reflecting the property held by the Mai Tai Trust; (9) an escrow statement, letters, an agreement of sale, and a copy of a canceled check reflecting that petitioners acquired assets held by the Harrill Trust and the amounts expended for such assets; (10) financial statements indicating the amounts owed by petitioners at the end of the years in issue; and (11) a detailed calculation with supporting documents that reflects the personal living expenses of petitioners during the years in issue. From the record as a whole, we are satisfied and so find that respondent has convincingly proven that petitioners understated their income taxes for 1980, 1981, and 1982 and that those understatements were accurately computed by respondent with the exception of the minor adjustments described hereinbefore. At trial and on brief petitioners have offered only implausible and inconsistent explanations for their behavior and for their failure to accurately report and pay their income taxes. Their repeated denials of any complicity in *245 the sale of drugs in the face of their conviction in the criminal case, as well as their insistence, in spite of overwhelming evidence to the contrary, that they possessed a substantial cash hoard as of December 31, 1979, which cash accounted for their acquisitions in the years under dispute is further evidence of their determination to persist in their fraudulent behavior. Although we have focused herein primarily on the conduct of Mr. Duffey, we are satisfied that Mrs. Duffey is an intelligent and reasonably well educated individual who not only participated in the distribution of drugs but was aware of the income being realized therefrom and that such income was subject to income tax but was not reported on the joint returns which she signed. Given the large increases in their net worth, we have no doubt that Mrs. Duffey knew that petitioners' true taxable income for the years 1980, 1981, and 1982 exceeded the income reported on their returns. Finally, after observing Mr. Duffey during the prosecution of this case, and learning of his past military record, we are convinced that he is a highly intelligent man who is capable of achieving any goal that he sets for himself. Consequently, *246 petitioners' substantial underreporting of taxable income was not the result of mere ignorance or a mistake. Instead, we are convinced that petitioners' actions were deliberate attempts to evade the payment of taxes that they each knew were owing. We conclude, therefore, that respondent has met the burden of proof with respect to the additions to tax for fraud with respect to both petitioners. 5. Addition to Tax for Substantial Understatements
Section 6661(a) provides an addition to tax of 10 percent of any underpayment attributable to a substantial understatement. An understatement occurs where the amount of tax required to be shown on a return exceeds the amount of tax actually shown on the return. Sec. 6661(b)(2). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1). Respondent has the authority to waive the addition upon a showing by the taxpayer that there was reasonable cause for the understatement and that the taxpayer acted in good faith. Sec. 6661(c). Petitioners bear the burden of proof with respect to this addition. Rule 142(a). With minor adjustments, we have *247 found that respondent's net worth calculation for 1982 is correct. Consequently even after the minor adjustments it is quite probable that there will be a substantial understatement in petitioners' income tax for 1982. Therefore, in view of the absence of any attempt by petitioners to obtain a waiver of the addition by proof that there was reasonable cause for the understatements or that they acted in good faith, the addition provided by section 6661 will apply if a computation under Rule 155 reveals that the understatement for 1982 was $ 5,000 or more. 6. Statute of Limitations
Since we have concluded that petitioners' returns for each of the years 1980, 1981, and 1982 are fraudulent, the deficiencies and additions to tax can be assessed against petitioners at any time. Sec. 6501(c)(1). Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners have consistently labeled this claim "selective prosecution", a term frequently used with reference to a similar argument in criminal actions. In civil cases, the Court of Appeals for the Ninth Circuit has used the term "discriminatory investigation". See St. German of Alaska E. Orthodox Catholic Church v. United States, 840 F.2d 1087, 1095 (2d Cir. 1988). See also Karme v. Commissioner, 673 F.2d 1062, 1064 (9th Cir. 1982), affg. 73 T.C. 1163↩ (1980), where the claim is referred to as being "closely analogous to a claim of selective or discriminatory prosecution." For the sake of convenience, the term "selective prosecution" is used in this opinion.
3. Petitioners contend that during the years under consideration they maintained adequate records of their income and expenses, that such records were seized by the authorities in the investigation leading to their criminal trial, and that such records have not been returned to them. However, the record in this case contains no reasonable basis for a determination that petitioners were unable to obtain possession of any records seized from them. Furthermore, the inadequacy of the records seized from them is clearly indicated by the fact that in the criminal case their income from drug activities was determined by the use of the net worth method.↩
4. The paragraph reads as follows: Based on the records seized from Duffey, the tracing of activities of various conspirators and the debriefing of numerous cooperating individuals, investigators were able to identify many of the salient points of this on-going criminal enterprise. Narcotics authorities believe that the Duffey organization was responsible for the distribution of 1.5 million Quaalude tablets during its period of activity from late 1979 to December 1981. These tablets wholesale for between $ 2.00 and $ 2.75 and are sold on the street for a minimum of $ 5.00.↩
5. If as believed by the narcotics authorities, the Duffey organization distributed 1.5 million quaalude tablets in the 2 years from late 1979 through 1980, the organization would have distributed 2,250,000 in the 3 years under consideration here. Even this figure is somewhat less than a computation based on Mr. Duffey's boasting as set out in the next paragraph of the report which is as follows: As early as shortly after the death of Goodman in October 1980 Duffey boasted that he was distributing 80,000 Quaalude tablets a month. He later showed Friedman records to corroborate these claims. In fact, in December 1980 Duffey held a dinner at the John Dominis Restaurant in Honolulu which was attended by John Adams, Claude Wells and others. The purpose of this party was to celebrate Duffey having made a million dollars in the drug business.
With a monthly distribution of 80,000 tablets, the total distribution for the 3 years under consideration would be 2,880,000 quaalude tablets which at $ 5 per tablet would have a street value of $ 14,400,000.↩
6. Mr. Duffey's mother, Lilah Connor (whose testimony has been reviewed and found to be admissible), did testify in the criminal trial that at some point prior to 1980 she saw a substantial amount of cash in Freida Duffey's dresser, but at the trial of this matter Mrs. Duffey denied any such sum ever existed.↩